1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
5   GREGORY A. OTT
    Deputy Attorney General
6   State Bar No. 160803
        455 Golden Gate Avenue, Suite 11000
7       San Francisco, CA 94102-7004
        Telephone: (415) 703-5964
8   Fax: (415) 703-1234
        Email: gregory.ott@doj.ca.gov
9   Attorneys for Respondent

10

11                  IN THE UNITED STATES DISTRICT COURT

12              FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14   **ADRIANA ARZOLA BEDOLLA,**                C 08-0172 SI (PR)

15                              Petitioner,      **MOTION TO DISMISS PETITION
                                                 FOR WRIT OF HABEAS CORPUS
16              v.                               AS UNTIMELY**

17   **TINA HORNBEAK, Warden,**

18                              Respondent.

19

20          California state prisoner Adriana Arzola Bedolla ("petitioner") has filed a petition for writ

21   of habeas corpus in this Court pursuant to 28 U.S.C. §§ 2241 & 2254(d).  Respondent hereby moves

22   this Court for an order dismissing the petition on the ground that it is untimely.  *See* 28 U.S.C. §

23   2444(d)(1).  A motion to dismiss in lieu of a an answer on the merits is appropriate where the

24   petition is procedurally defective.  *See White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989); *O'Bremski

25   v. Maass*, 915 F.2d 418, 420 (9th Cir. 1990); Rules Governing 28 U.S.C. § 2254 Cases, Rule 4 and

26   Advisory Committee Notes.  Respondent has not noticed this motion for hearing as petitioner is in

27   custody and not represented by counsel.

28

1

## PROCEDURAL HISTORY

2

In 2001, a San Benito County Superior Court jury convicted petitioner of second degree

3 murder, Cal. Penal Code §§ 187-189; assault upon a child under eight years of age by means of force

4 likely to produce bodily injury, resulting in death, *id.* § 273ab; felony child abuse, *id.* § 273a(a); and

5 infliction of cruel or inhuman corporal injury upon a child, *id.* § 273d(a). Exh. A at 1-2. Each of

6 the latter three counts was enhanced for infliction of great bodily injury, Cal. Penal Code §

7 12022.7(a). Exh. A at 1-2. Petitioner was sentenced to twenty-five years to life in prison. Exh. A

8 at 2.

9

On March 10, 2003, the California Court of Appeal affirmed petitioner's judgment in an

10 unpublished opinion. Exh. A. The California Supreme Court denied review on May 14, 2003. Exh.

11 B.

12

On April 30, 2007, petitioner filed a petition for writ of habeas corpus in the California

13 Court of Appeal (no. H031492).[1/] Exh. D. The petition was denied on May 11, 2007. Exh. D.

14

On June 4, 2007, petitioner filed a petition for writ of habeas corpus in the California

15 Supreme Court. Exh. E. The petition was denied as untimely on October 10, 2007. Exh. E.

16

On or after December 20, 2007 (signature date), petitioner constructively filed the instant

17 petition for writ of habeas corpus by delivering it to prison authorities for mailing to this Court; the

18 petition was filed in fact on January 11, 2008.

19

## ARGUMENT

20

The petition was filed beyond the one-year statute of limitations. It must be dismissed.

21

Petitioner's 28 U.S.C. § 2254 petition is governed by the Antiterrorism and Effective

22 Death Penalty Act of 1996, which imposes a one-year statute of limitations on the filing of federal

23 habeas petitions. 28 U.S.C. § 2244(d)(1). Here, the limitations period commenced against petitioner

24 on August 12, 2003, ninety days after the California Supreme Court denied direct review, when the

25 time for filing a petition for writ of certiorari expired. *See Bowen v. Roe*, 188 F.3d 1157, 1158-59

26

27

---

28

1. Petitioner did not file a petition for writ of habeas corpus in San Benito County Superior Court. Exh. C.

Mtn. To Dismiss Pet. For Writ Of Habeas Corpus As Untimely - *Bedolla v. Hornbeak*, No. C 08-0172 SI (PR)

(9th Cir. 1999); Exh. B.  The limitations period expired a year later, on August 12, 2004.  *See* 28 U.S.C. § 2244(d)(1).  Indeed, petitioner permitted 1,357 days of untolled time to pass before taking any collateral action to challenge her conviction, by filing, on April 30, 2007, a petition for writ of habeas corpus in the California Court of Appeal.  Exh. D.  Although such a filing would ordinarily toll the statute of limitations period,[2/] 28 U.S.C. § 2244(d)(2), it did not in this case, as the period had already expired.  *See Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003).  Thus, petitioner filed the instant petition 1,591 days after the finality of his state court judgment, or 1,255 days after the statute of limitations period expired.  The petition accordingly must be dismissed with prejudice as untimely.  *See* 28 U.S.C. § 2244(d)(1).

## CONCLUSION

Accordingly, for the reasons stated, respondent respectfully requests that the petition for writ of habeas corpus be dismissed with prejudice as untimely.

Dated:  March 6, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

PEGGY S. RUFFRA
Supervising Deputy Attorney General


/s/ Gregory A. Ott
GREGORY A. OTT
Deputy Attorney General

Attorneys for Respondent

---

2.  Petitioner's California Supreme Court petition could not have tolled the statute of limitations for the additional reason that it was denied as untimely and therefore not "properly filed" for purposes of 28 U.S.C. § 2244(d)(2).  *See Pace v. DiGuglielmo*, 544 U.S. 408 (2005); *Bonner v. Carey*, 425 F.3d 1145, 1148-49 (9th Cir. 2005), *amended* 439 F.3d 993 (9th Cir.), *cert. denied*, 127 S. Ct. 132 (2006); Exh. E (citing *In re Robbins*, 18 Cal. 4th 770, 780 (1998)).

Mtn. To Dismiss Pet. For Writ Of Habeas Corpus As Untimely - *Bedolla v. Hornbeak*, No. C 08-0172 SI (PR)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Bedolla v. Hornbeak, Warden**

No.:    **C 08-0172 SI (PR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter; my business address is 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004.

On <u>March 6, 2008</u>, I served the attached

**MOTION TO DISMISS PETITION FOR WRIT OF HABEAS CORPUS AS UNTIMELY**

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at San Francisco, California, addressed as follows:

Adriana Arzola Bedolla
CDC&R No. W-92502
Valley State Prison for Women
P.O. Box 99
Chowchilla, CA 93610-0099

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on March 6, 2008, at San Francisco, California.

| S. Agustin | /s/ S. Agustin |
|:---:|:---:|
| Declarant | Signature |

40226257.wpd

# EXHIBIT A

THE PEOPLE, Plaintiff and Respondent, v. ADRIANA  BEDOLLA, Defendant and Appellant.
H023760

COURT OF APPEAL OF CALIFORNIA, SIXTH APPELLATE DISTRICT

2003 Cal. App. Unpub. LEXIS 2329

March 10, 2003, Filed

NOTICE:

[*1] NOT TO BE PUBLISHED IN OFFICIAL REPORTS CALIFORNIA RULES OF COURT, RULE 977(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 977(B). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 977.

PRIOR HISTORY: San Benito County Super.Ct.No. CRF01-40316.

DISPOSITION: The judgment is affirmed.

CORE TERMS: bruise, trustworthiness', reliability, hit, hair, babysitter, custody, arrived, declarant, happened, fracture, bedroom, minute, skull, seat, child abuse, indicia of reliability, particularized, hearsay evidence, hearsay statement, responded, daughter, murder, firmly, floor, brain, ear, hearsay rule, mental state, neglect'

JUDGES: Wunderlich, J. WE CONCUR: Rushing, P.J., Elia, J.

OPINION BY: Wunderlich

OPINION

Adriana Arzola Bedolla was charged by information with first degree murder (*Pen. Code, § 187, subd. (a)*), assault upon a child under eight years of age by means of force likely to produce bodily injury, resulting in death (*Pen. Code, § 273ab*), felony child abuse (*Pen. Code, § 273a, subd. (a)*), and infliction of cruel or inhuman corporal injury upon a child (*Pen. Code, § 273d, subd. (a)*). With respect to all counts but the murder charge, the information alleged that defendant had inflicted great bodily injury (*Pen. Code, § 12022.7, subd. (a)*).

A jury found defendant guilty of second degree murder, a lesser offense of the first degree murder,

and found her guilty of all the remaining counts and found[*2] true the great bodily injury allegation as to each count. The trial court sentenced defendant to 25 years to life on the murder count and stayed the sentences on the other counts pursuant to *Penal Code section 654*. On appeal, defendant contends that the trial court erred by admitting hearsay evidence of the victim's prior statements under *Evidence Code section 1360*. n1 We conclude that the statements possessed adequate indicia of reliability to justify admission, and affirm the judgment.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1  All further statutory references are to the Evidence Code unless otherwise specified.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

FACTS

A. Events leading up to February 19, 2001

Rigoberto Bedolla and Librada Perez met at a nightclub in 1995 and began dating. He moved in with her, and she became pregnant. On April 7, 1998, the victim in this case, Ilse Bedolla, was born. Her parents split up in January 1999, but continued to see each other and at times to maintain sexual relations. After their separation, Rigoberto began dating the[*3] defendant. She expressed anger and frustration about Rigoberto's preferring Perez to her. By the fall of 1999, defendant was pregnant, and Rigoberto moved in with her at her parents' home. Almost exactly two years after his daughter Ilse's birth, he had a son, Rigoberto Jr., with defendant. They moved into their own apartment in Hollister and later married.

In April 2000, Perez was arrested for being under the influence of drugs. n2 She subsequently lost custody of Ilse, who was placed in the custody of her father, Rigoberto. Perez had visitation with Ilse on Mondays and Tuesdays. Typically, she would pick up Ilse from the babysitter who watched Ilse and Rigoberto, Jr., and she would return her to the babysitter in order to avoid meeting Rigoberto or defendant.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2  This was one of many arrests, and Ilse's mother had already lost custody of two of her three older children. She had not lost custody of the third child, an eight-year-old son, but a cousin of hers had

taken him in.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

On one of these visits, [*4] on November 20, 2000, Perez noticed that some of her daughter's hair was missing from behind the ear. She gathered Ilse's hair into a ponytail and asked, "What do you have here?" Ilse responded, " 'Mommy, Nanna [defendant] pulls hair' " and she also " 'hits like this,' " while holding her hand to her face. Perez became worried and told the babysitter that she would not return Ilse to the babysitter until she had spoken to Rigoberto about this. She then waited in her home, expecting Rigoberto to show up. Instead, defendant came. Perez tried to close the door on her, but defendant pushed in, demanded Ilse and started shouting at Perez. Perez let Ilse go.

After they had left, Perez called the police to tell them what she had seen. An officer came to her apartment, and she told him that defendant was yelling at Ilse as they were leaving. She also reported the hair pulling to the Child Protective Services in Santa Clara and San Benito counties. Additionally, she filed papers in court to regain custody of her daughter; however, she missed the December 2000 hearing on the matter due to car trouble. A new hearing was set for January 2001. In connection with the custody hearing, both parents[*5] were ordered to take drug tests, and Perez's came back positive.

Also in preparation for the custody hearing, Rigoberto recorded a videocassette showing him with Ilse on his lap. On the tape, he asked her who cut her hair and Ilse replied her mother did. He also pointed to her hand and asked, "and here, what happened here?" and she answered that her mother hit her on the hand.

Olivia Hernandez, a friend of Perez's, testified that she too saw the spots where the hair had been pulled, and that Ilse told her that defendant hit her. Ilse demonstrated by slapping herself. Hernandez also testified that when she went with Perez to return Ilse to the babysitter, the little girl would often cry and refuse to leave the car.

Rigoberto's stepmother testified that at a Christmas 2000 family event, she saw defendant give Ilse a very hard look, causing Ilse to begin crying. She also heard defendant refer to Ilse as a "parche con patas" or "patch with paws."

Defendant's aunt testified that she babysat Ilse and Rigoberto Jr. from the end of 2000 until the date of Ilse's death, February 19, 2001. She said Ilse loved defendant, whom she called "Mommy," and that defendant never mistreated her.

On[*6] February 15, 2001, Rigoberto came home from work to find Ilse had two scratches and bruising on her forehead. Defendant explained that she had opened the car door near Ilse's car seat

and then had gone to take Rigoberto Jr. out of a different place in the car. Ilse fell out of her car seat and got stuck between the door and the doorframe, causing the injuries. Defendant's aunt also saw the injuries, as well as bruising on the arm.

B. Events of February 19, 2001

On February 19, 2001, when Ilse was two years and 10 months old, she and her brother went to the babysitter as usual. Perez picked her up at 9:00 a.m. for their visitation, and she saw bruises all over her daughter from the incident of February 15. She demanded to know what had happened, but Ilse just looked away as if she were about to cry. Then the babysitter told Perez that Ilse had fallen from her car seat. Perez did not believe that such injuries could possibly occur from falling from a car seat. When she got Ilse home, she asked her again what happened, and received the same response. Perez then called her friend Hernandez who suggested she go to the police. Hernandez accompanied Perez to the Gilroy Police[*7] Station and acted as her interpreter. The police suggested that Perez not return Ilse to the babysitter but rather talk to the father and demand an explanation of the injuries when he came to pick her up. They told her to get back to them if he was unable to provide a good explanation for Ilse's injuries. Perez asked Ilse if her father hit her, and she responded that he did not but that defendant did.

When Rigoberto arrived at the babysitter's, he found that Ilse was not there and he waited 15 minutes for Perez to deliver her. Then he called Perez to find out what was happening. Perez told him she wanted an explanation for the bruises on Ilse's face and she wanted him to come over. When he arrived at Perez's apartment, he told her that defendant had told him the injuries were caused by a fall from the car seat. Perez was not satisfied with the answer and called the police, who came over while Rigoberto waited.

He repeated his explanation to the police who thought they were responding to a child custody dispute. They asked who had custody and Perez produced court papers showing that she had visitation. They then told her to give the child over to Rigoberto. Ilse cried, screamed, and[*8] did not want to go. However, she did go home in an uneventful drive. Rigoberto neither hit her, nor was he involved in a traffic accident, which could have caused injuries.

When they got home, Rigoberto told defendant that the police did not believe the explanation that Ilse had fallen from her car seat. Defendant was furious. They talked about just returning Ilse to her mother's custody. Rigoberto was in the home no more than 10 minutes, as he had to go to a job where he was laying tile in a bathroom. He arrived at the job around 6:20 p.m. Around 8:00 p.m., he received a call from defendant who said that Ilse was sick and she wanted him to "come back home, hurry up."

Rigoberto arrived home within five minutes and found Ilse unconscious on the bedroom floor, wearing only her underpants. Defendant said that she had been in the kitchen when she heard a loud thump and went in to discover Ilse lying unconscious on the bedroom floor. Defendant put some alcohol on Ilse and put her in water to try to revive her. There were numerous bruises on her chest and forehead that were caused by defendant's efforts to resuscitate her.

Five or 10 minutes after he arrived home, Rigoberto told defendant[*9] to call 911. In the meantime, he was attempting mouth-to-mouth resuscitation. He noticed the back of Ilse's head felt very soft. Defendant was fretting, saying they would not believe her and she would be taken away.

Hollister Officer Reynoso responded to the scene within one minute of the call. He saw Ilse, wearing only underpants, on the floor with her father trying to revive her. Ilse's eyes and mouth were partly open, and she had bruises on her chest, elbow, legs, and forehead and "really severe bruising in her ear." She was not responsive and did not appear to be breathing. Defendant told Reynoso that Ilse had hit her head on the floor frame while running around the room.

Shortly thereafter, Officer LaMonica arrived to assist Reynoso. He opened Ilse's eyes and checked her pupils. They were dilated and unresponsive to the flashlight. He saw three or four bruises to her chest, scratches by her eyes, reddish-purplish bruising behind her left ear, and contusions to her elbow and knees. Most of the injuries looked very recent, so he asked defendant what had happened. She responded in a very calm manner that Ilse had run into the bedroom wall. LaMonica was skeptical and asked her how[*10] she got injuries all over her body if all she did was smash into a wall. Defendant at first said she didn't know but later suggested that she had come home from her mother's bearing various bruises. At trial, both Rigoberto and Perez agreed that Ilse did not have many of those bruises when she returned home the evening of February 19, 2001.

LaMonica demanded more of an explanation from defendant. She explained that she and Rigoberto Jr. were in the living room watching television and asked Ilse to go into the bedroom and get one of the baby's toys. She went running into the room. Shortly thereafter, defendant heard a thud that sounded like Ilse hit the wall. When she went into the bedroom to check, Ilse was unconscious on her hands and knees. Defendant felt a bump on the back of Ilse's head. At that point, Ilse vomited, and defendant changed her into fresh pajamas. Ilse had regained consciousness, and seemed to be all right, so defendant brought her back into the living room to watch cartoons.

A little later, Ilse lost consciousness again, and defendant put her in the bathtub and ran cold water over her head. She was vomiting and blood was coming out of her mouth. She then put Ilse[*11] on a towel on one of the beds. Defendant talked to her mother on the phone, and she suggested that defendant put some rubbing alcohol on cotton and hold it under Ilse's nose. When that did not revive her, defendant called her husband. She did not call 911 because she was scared. It was over 30 minutes from the time she first found Ilse unconscious to the time that she called 911.

Paramedics arrived on the scene shortly after the police. They observed bruises on Ilse's arms, legs and ears. She had dried blood on her lips and did not respond to any of the tests. Her eyes were fixed with dilated pupils. They transported Ilse to Hazel Hawkins Hospital.

A little after 9 p.m., Officer Egan arrived at the scene to question defendant. He asked her what had happened. She told Egan that Ilse had hit her head on the bedroom door while she was running out of the room. Defendant cradled her in her arms as she went in and out of consciousness. After several minutes, Ilse vomited and regained consciousness and was able to answer questions. She then recounted the same version of events she told LaMonica. While Egan was questioning her, he got a call from the dispatcher who had him call the doctor[*12] at Hazel Hawkins Hospital. The doctor

said a CAT scan showed Ilse had a skull fracture and massive swelling and that she was being flown to Lucille Salter Packard Stanford Hospital. He placed defendant under arrest and searched the apartment. He found a throw rug in the bedroom with a damp, off-red stain that looked like someone had tried to wash it away. There was also toilet paper and other paper with blood and mucous on it.

C. The medical evidence

Ilse's scalp, skull, and brain all showed signs of massive injury. The CAT scan showed a fracture on the left side of the occipital bone located at the base of the brain. There were two different depressions from this fracture where the bone was forced inward toward the brain. There was also a second fracture on the right side of Ilse's skull by her mastoid process. Ilse had bleeding or hematomas throughout her skull. Huge pools of blood collected behind her left ear in the occipital area, beneath the tentorium that separates the cerebellum from the cerebrum, as well as in the dura and arachnoid layers of the brain. Such hemorrhaging is usually caused by a trauma such as shaking.

Dr. Skargard examined Ilse when she arrived,[*13] brain dead, at Stanford Hospital. His examination revealed two skull fractures, one with two depressions. He concluded that Ilse had to have suffered at least three separate impacts to the rear of her head. He also found fingerprint or thumbprint sized bruises and superficial parallel scrapes on Ilse's torso that were suggestive of grip marks that might be produced if she were firmly grabbed and shaken. Ilse's injuries were consistent with having been shaken next to a hard, immovable object, like a table, that her head smashed repeatedly into. Dr. Skargard also found evidence of hemorrhage in Ilse's retinas. Such injuries could not have happened accidentally. A child suffering these injuries would not have revived, felt fine, and then relapsed again into unconsciousness.

Forensic pathologist Dr. John Hain performed an autopsy on Ilse's body on February 22, 2001. He found bruises on Ilse's face, shoulders, chest, arms, legs and head. He also found a four-inch and a two-inch fracture to the back of Ilse's skull. The crushing of the skull was consistent with the impact of a hard object to the back of her head. The fractures suggested she had received two to four separate blows to the[*14] head by the acceleration of her head against some "hard protruding smooth surface that's got a lot of mass to it so it doesn't move." Such an object might be a rounded corner edge or the edge of a bathtub. They could have been caused by an automobile or falling from a height more than ten feet. The injuries were not accidental and were clearly caused by a blunt force.

Dr. Robert Lawrence, another pathologist, reviewed the autopsy report, CAT scan and X-rays, and concluded that the cause of death was a combination of shaking and blunt blows to the head. Ilse could not have suffered her injuries by running into a wall or doorknob. Furthermore, it would be highly improbable for her to have been injured the way she was by injuries received in Rigoberto's truck on the way home. The space inside the truck was too limited to build up enough momentum to cause the type of injuries suffered by Ilse. Rather, Dr. Lawrence concluded, Ilse's injuries were caused by her head being repeatedly shaken against a "smooth, broad surface," such as a concrete floor or a stucco wall.

A family violence allegation specialist also testified, opining that the medical evidence in the case was clearly suggestive[*15] of battered child syndrome. He noted that Ilse had different colored

bruises all over her body, suggesting that they had been inflicted over an extended period of time. Dr. Skargard also felt Ilse had shown signs of battered child syndrome, based on inconsistencies in the explanation of how Ilse was injured, the delay in seeking help, the physical findings, and the presence of older bruises elsewhere on Ilse's body.

### D. Defense evidence

Saul Alcalan is married to Carolina Alcalan, defendant's aunt who was babysitting Ilse and Rigoberto Jr. from late 2000 to the date of Ilse's death. He testified he was home on February 19, 2001, when Rigoberto came over to pick up the children. He asked Rigoberto why Ilse had bruise marks on her. Alcalan suggested that Rigoberto leave Ilse with them that night, as Perez had not yet returned her to the babysitter, and Rigoberto was in a hurry to get to his second job. While they were talking, Perez called to tell Rigoberto that she was not going to bring Ilse back and that he should come over to talk. At that point, Rigoberto went to his truck to go get Ilse. Alcalan volunteered to accompany him, but Rigoberto went alone. Rigoberto did[*16] not have a car seat in his truck.

## DISCUSSION

Defendant's sole complaint with the trial court proceedings is that evidence of Ilse's prior statements of past physical abuse by defendant was improperly admitted under *Evidence Code section 1360*, n3 which provides for admission of "a child's hearsay statement describing an act of child abuse upon that child provided three conditions are met: (1) the court finds that the time, content and circumstances of the statement provides sufficient indicia of reliability; (2) the child either testifies at the hearing or [is unavailable and] there is corroborating evidence of the hearsay statements; and (3) the proponent of the statement gives notice to the adverse party that it intends to use the statement at trial." (*People v. Brodit (1998) 61 Cal.App.4th 1312, 1329*; see also *In re Cindy L. (1997) 17 Cal.4th 15, 29, 947 P.2d 1340*.) She argues that the victim's hearsay statements n4 failed to satisfy the threshold standard of reliability to qualify for admission without violation of her right to confrontation. n5

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n3 *Section 1360* reads in full: "(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply: [P] (1) The statement is not otherwise admissible by statute or court rule. [P] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [P] (3) The child either: [P] (A) Testifies at the proceedings. [P] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child. [P] (b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the

statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement. [P] (c) For purposes of this section, 'child abuse' means an act proscribed by *Section 273a, 273d,* or *288.5 of the Penal Code,* or any of the acts described in *Section 11165.1 of the Penal Code,* and 'child neglect' means any of the acts described in *Section 11165.2 of the Penal Code.*"

[*17]

n4  Three statements were admitted after a *section 1360* hearing. These included two statements to Ilse's mother--(1) after Perez noticed hair missing, she asked Ilse, "What do we have here?" Ilse responded, "Mama, Nanna pulls hair." When Perez asked "why," Ilse answered, "Mommy, Nanna pulls hair and hits like this, like this," and demonstrated; (2) after her "comadre" came over to take Perez and her daughter to the Gilroy police station on February 19, 2001, to show them Ilse's bruises, Perez asked Ilse if her father spanked her. Ilse replied, " 'No, mommy. Nanna hits, daddy does not hit,' "--and one to Olivia Hernandez: (1) when Hernandez asked Ilse what happened to her hair, Ilse answered, " 'Nanna hit me.' 'Nanna know how' . . . 'aqui' . . . 'like this, like this,' " slapping herself to demonstrate.

n5  The People contend that defendant's alleged failure to object on *section 1360* and confrontation grounds forecloses appellate review. We disagree. Defendant did object to the introduction of the hearsay evidence on the ground that it did not satisfy the reliability requirements of *section 1360.* We agree with defendant that defense counsel had sufficiently preserved the issue for review by his previous objection and that any further objections by defense counsel would have been futile. Accordingly, we shall reach the merits of defendant's claim and need not reach defendant's alternative claim that her counsel was ineffective if he did not preserve the objection.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*18] " 'The Confrontation Clause of the Sixth Amendment, extended against the States by the Fourteenth Amendment, guarantees the right of a criminal defendant "to be confronted with the witnesses against him." The right of confrontation includes the right to cross-examine witnesses.' (Richardson v. Marsh [(1987)] *481 U.S. [200,] 206.*)" (*People v. Fuentes (1998) 61 Cal.App.4th 956,*

963-964.) "The confrontation clause precludes admission of hearsay evidence unless the prosecution demonstrates that the statement possesses adequate indicia of reliability." (People v. Roberto V. (2001) 93 Cal.App.4th 1350, 1373.) "An exception to the hearsay rule is not valid unless the class of hearsay evidence proposed for admission is inherently reliable." (In re Cindy L., supra, 17 Cal.4th at p. 28.) "When statements are admitted under a firmly rooted exception to the hearsay rule or when they contain particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to their reliability (the 'residual trustworthiness test'), their admission does not violate the confrontation clause.[*19] [Citations.]" (People v. Duke (1999) 74 Cal.App.4th 23, 29-30, fns. omitted.) " 'Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.' [Citations.]" (People v. Trimble (1992) 5 Cal.App.4th 1225, 1233.)

As defendant points out, section 1360, enacted in 1995 (Stats. 1995, ch. 87, § 3), is "too new to be considered a firmly rooted hearsay exception because it does not reflect 'longstanding judicial and legislative experience in assessing the trustworthiness' of the statement it covers; the statute must therefore satisfy the 'particularized guarantees of trustworthiness' standard under the confrontation clause." (People v. Eccleston (2001) 89 Cal.App.4th 436, 445.) Defendant maintains that the hearsay accounts of Ilse's statements fail to meet the established standard of reliability necessary to comply with confrontation clause guarantees.

"In assessing whether hearsay evidence which does not fall within a firmly rooted exception possesses 'particularized[*20] guarantees of trustworthiness' the totality of the circumstances surrounding the making of the statement which render the declarant particularly worthy of belief must be examined. 'In other words, if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial.' [Citation.]" (People v. Greenberger (1997) 58 Cal.App.4th 298, 327; see also People v. Bryden (1998) 63 Cal.App.4th 159, 174- 175.)

" 'The nonexhaustive list of factors that the United States Supreme Court has cited as relevant to the reliability of hearsay statements made by child witnesses in . . . abuse cases are (1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate. [Citation.]' [Citation.]" (In re Lucero L. (2000) 22 Cal.4th 1227, 1239, 998 P.2d 1019; see also People v. Roberto V., supra, 93 Cal.App.4th a p. 1374.) n6  The third factor is particularly relevant in the[*21] context of sexual abuse, not an issue in this case. (Ibid.)

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n6  "Section 1360, subdivision (a)(2) 'effectively incorporates' [the particularized guarantees of trustworthiness] standard by requiring that the time, content and circumstances of the statement itself provide sufficient indicia of reliability. The statute goes on in subdivision (a)(3)(B) to provide that the child also be unavailable and that there be corroboration. There can be no constitutional objection

to such additional requirements as section (a)(3)(B) may impose as a condition to the admission of such third party testimony, since the Wright standards of trustworthiness are independently required by subdivision (a)(2). Moreover, our Supreme Court has held that 'the factors bearing on a statement's reliability are not limited to those specifically enumerated in . . . *Idaho v. Wright [(1990) 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139]*--any factor bearing on reliability may be considered.' [Citation.]" (*People v. Eccleston, supra, 89 Cal.App.4th 436, 445.*)

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*22] To determine whether a hearsay statement satisfies the " 'required threshold of trustworthiness,' a trial court "may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." ' [Citation.] . . . In this context, assessing trustworthiness ' "requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." ' [Citation.]" (People v. Duarte, supra, 24 Cal.4th at p. 614.) We examine " 'the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief.' [Citation.] Other corroborating evidence presented at trial may not be used to make a finding of reliability." ( People v. Roberto V., supra, 93 Cal.App.4th at p. 1374.) Although we undertake an independent review of the record, we reverse a trial court's determination that the statements bore sufficient indicia of reliability only if the court abused its discretion. ([*23] *In re Cindy L., supra, 17 Cal.4th at p. 35*; People v. Roberto V., supra, 93 Cal.App.4th at p. 1375; *People v. Hernandez (1999) 71 Cal.App.4th 417, 425*; *People v. Brodit, supra, 61 Cal.App.4th at p. 1329*.)

In the instant case, numerous factors support the conclusion that the victim's statements bore adequate indicia of trustworthiness. With respect to spontaneity and consistent repetition, Ilse told her mother and Olivia Hernandez essentially the same story as to the acts committed upon her by defendant (hitting her and pulling her hair). Moreover, the questions that led to Ilse's statements were either not leading, such as "what do you have here?" or were leading in a direction other than toward the defendant, such as "did your daddy spank you?" Ilse's statements to her mother and Hernandez appear to have the spontaneity necessary to indicate reliability. (See *People v. Eccleston, supra, 89 Cal.App.4th at p. 446*; People v. Duke, supra, 74 Cal.App.4th 23, 30.) Moreover her responses were consistent. The repetition of consistent statements that corroborate each other provides[*24] a measure of trustworthiness. (See *U.S. v. Yarbrough (9th Cir. 1988) 852 F.2d 1522, 1533*; *People v. Eccleston, supra, 89 Cal.App.4th at p. 446*; *People v. Terrones (1989) 212 Cal. App. 3d 139, 147, 260 Cal. Rptr. 355*.) Corroboration " 'is an additional safeguard against the possibility of fabrication by very young witnesses whose out-of-court statements are insulated from the rigors of cross-examination.' [Citations.]" (*People v. Eccleston, supra, 89 Cal.App.4th at p. 449*.)

Other factors relevant to a determination of the statements' reliability include the mental state of

the declarant (Ilse) and her lack of motive to fabricate. Regarding Ilse's mental state, when Perez returned her to the babysitter, Ilse screamed and cried and refused to leave the car. Ilse's actions manifesting her mental state--she was frightened, did not want to return to defendant to be beaten again, and preferred to stay with her mother in a less frightening environment--corroborate her out-of-court statements. Additionally, there is nothing in the record to suggest that Ilse had a reason to falsify the accusations against defendant, particularly[*25] given her age. (People v. Roberto V., supra, 93 Cal.App.4th at p. 1374.) Defendant suggests that because a custody battle was going on, each parent was trying to collect data showing that the other parent was not fit. One example was the videotape that Ilse's father took of Ilse where she said her mother slapped her hand. The statements were not evidence against Rigoberto, however, but against his wife. Moreover, as noted above, the statements were elicited as a result of questions that were not leading. Her unexpected responses were consistent.

We conclude, based upon our consideration of the record in its entirety, that the trial court did not abuse its discretion by finding Ilse's statements adequately reliable and admissible under *section 1360*. (*People v. Brodit, supra, 61 Cal.App.4th at p. 1330*.) The same factors establishing reliability under *section 1360* "satisfy the 'particularized guarantees of trustworthiness' standard under the confrontation clause." (*People v. Eccleston, supra, 89 Cal.App.4th at p. 445*.) Because we conclude the court did not err in admitting the statements, we need not reach the question of whether the[*26] admission of the statements was reversible or harmless error.

DISPOSITION

The judgment is affirmed.

Wunderlich, J.

WE CONCUR:

Rushing, P.J.

Elia, J.

# EXHIBIT B

# CALIFORNIA APPELLATE COURTS



## Case Information

**Supreme Court**                          [ Change court ▼ ]

Court data last updated: 03/03/2008 02:53 PM

| Supreme Court |
|---|
| Welcome |
| Search |
| E-mail |
| Calendar |
| Help |
| Opinions |

C|C
home

**Case Summary**   **Docket**   **Briefs**
**Disposition**   **Parties and Attorneys**   **Lower Court**

## Docket (Register of Actions)

**PEOPLE v. BEDOLLA**
**Case Number** <u>S114966</u>

| Date | Description | Notes |
|---|---|---|
| 04/10/2003 | Petition for review filed | by counsel for appellant (Adriana Bedolla) |
| 04/10/2003 | Record requested | |
| 04/11/2003 | Received Court of Appeal record | file jacket/briefs/two accordian files |
| 05/14/2003 | Petition for review denied | |

<u>Click here</u> to request automatic e-mail notifications about this case.

© 2007 Judicial Council of California

# EXHIBIT C



# Superior Court of California
# County of San Benito

*440 Fifth Street*
*Hollister, California 95023*
*(831) 636-4057*

Docket Number: CR-01-40316

Name of Defendant: Bedolla, Adriana Arzola

Date of Birth: 04-01-1978

Request for Petition for Writ of Habeas Corpus-No Petition filed.

Thank you,

Date:    March 3, 2008                    By: _____
                                                Oscar Rivera
                                                Legal Process Clerk

# EXHIBIT D

# CALIFORNIA APPELLATE COURTS

## Case Information

Welcome

Search

E-mail

Calendar

Help

Opinions

C|C
home

### 6th Appellate District

Change court ▾

Court data last updated: 03/03/2008 03:05 PM

**Case Summary   Docket   Scheduled Actions   Briefs
Disposition   Parties and Attorneys   Trial Court**

## Docket (Register of Actions)

**Bedolla-Arzola on Habeas Corpus**
**Case Number** H031492

| Date | Description | Notes |
|------|-------------|-------|
| 04/30/2007 | Petition for a writ of habeas corpus filed. | |
| 05/11/2007 | Case fully briefed. | |
| 05/11/2007 | Order denying petition filed. | The petition for writ of habeas corpus is denied (PBM, NM, RJM) |
| 05/11/2007 | Case complete. | |
| 07/11/2007 | Record purged - to be shipped to state records center. | |

**Click here to request automatic e-mail notifications about this case.**

©2007 Judicial Council of California

# EXHIBIT E

# CALIFORNIA APPELLATE COURTS

## Case Information

Supreme
Court

Welcome

Search

E-mail

Calendar

Help

Opinions

C|C
home

## Supreme Court

Change court

Court data last updated: 03/03/2008 02:53 PM

Case Summary   Docket   Briefs
Disposition   Parties and Attorneys   Lower Court

## Docket (Register of Actions)

**BEDOLLA (ADRIANA) ON H.C.**
**Case Number S153157**

| Date | Description | Notes |
|------|-------------|-------|
| 06/04/2007 | Petition for writ of habeas corpus filed | Adriana Bedolla, petitioner in pro per |
| 10/10/2007 | Petition for writ of habeas corpus denied | (See In re Robbins (1998) 18 Cal.4th 770, 780.) |

**Click here** to request automatic e-mail notifications about this case.

©2007 Judicial Council of California

S153157

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re ADRIANA BEDOLLA on Habeas Corpus

The petition for writ of habeas corpus is denied. (See *In re Robbins* (1998) 18 Cal.4th 770, 780.)

SUPREME COURT
FILED

OCT 1 0 2007

Frederick K. Ohlrich Clerk

Deputy

Chief Justice